**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Neil Grossman, Esq.
40 Calumet Avenue
Lake Hiawatha, New Jersey 07034
(973) 335-6409
Fax (973) 335-3717
e-Mail neil@bgandg.com
*Attorneys for plaintiffs James Hurd and Brandt Pettersen*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| JAMES HURD and BRANDT PETTERSEN, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF,<br><br>v.<br><br>CONDUENT BUSINESS SERVICES, LLC,<br><br>DEFENDANT. | Civil Action No:<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL ENCLOSED |

## INTRODUCTION

1. This case arises from a data breach. Defendant Conduent Business Services, LLC, (hereafter "Conduent") is a business process outsourcing and technology company that, as part of its normal business operations, collects highly

sensitive data that its clients maintain regarding third parties, including social security numbers, financial information, and other details. More specifically, among other clients Conduent maintained data on behalf of Blue Cross and Blue Shield of Illinois (hereafter "BCBSI"), which in turn collected and maintained information regarding BCBSI's policy holders.

2. In a story that has become all too familiar, an unauthorized third-party gained access to SRP's network beginning on October 21, 2024, and absconded with personally identifying information (hereafter, "PII"). Criminals can now sell the victims' data on the black market for the purpose of stealing their identities. None of this would have occurred if Conduent had implemented reasonable data security measures.

3. Plaintiffs James Hurd and Brandt Pettersen were victims of the data breach. They bring this action on behalf of themselves and all others similarly situated, seeking damages for the injuries that Defendant's negligence have and will cause, as well as injunctive relief to ensure that the data Defendant continues to store will be protected by reasonable data security practices going forward.

**PARTIES**

4. Plaintiff James Hurd resides at 394 Fatty Lockhart Road, Millry, Alabama, where he intends to remain.

5. Plaintiff Brandt Pettersen resides at 214 Plains Drive, Apartment 5, Chatham, Illinois, where he intends to remain.

6. Defendant Conduent is a Delaware corporation with its principal place of business at 100 Campus Drive, Suite 200 Florham Park, New Jersey. On information and belief, a substantial portion of the relevant acts giving rise to this lawsuit took place at Conduent's corporate headquarters.

**JURISDICTION AND VENUE**

7. This Court had personal jurisdiction over Conduent because its principal place of business is (and at all relevant times was) located in Florham Park, New Jersey, in this District.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because at least two member of the classes, Plaintiffs Pettersen and Hurd, are citizens of a state different from Conduent; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; the proposed class and subclass each consist of more than 100 members, and none of the exceptions under the subsection apply to this action.

9. Venue is proper in this District, and in this Vicinage, because Conduent's principal place of business is in Morris County, New Jersey. *See* 28 U.S.C. §1391(b)(1).

**FACTUAL ALLEGATIONS**

**A. Conduent allowed Plaintiffs' data to be stolen.**

10. According to the data breach notice that Plaintiffs received, an unauthorized third-party gained remote access to Conduent's network beginning on October 21, 2024, and continuing through January 13, 2025, and acquired information from Plaintiffs and Class and Subclass members. A true and correct copy of the Notice Letter is attached as Exhibits 1 and 2.

11. Based on the disclosures on the Notice, Conduent provided services for BCBSI and through that relationship obtained information related to BCBSI policyholders.

12. Based on the disclosures in the Notice, information pertaining to Plaintiffs, Class members and Subclass members was part of the data acquired by an unauthorized external party in the Data Breach.

13. The specific information that was acquired includes: name, address, date of birth, and Social Security Number. Exhibit 1, at 1; Exhibit 2, at 1.

14. Because this data breach targeted personally identifying information, it is reasonable to infer that unauthorized third-parties will use victims' data for fraudulent purposes, including identity theft.

15. Since discovering the Data Breach, Conduent has "safely restored our systems and operations." Exhibit 1, at 1. This statement provides no information as to how the Data Breach occurred, nor does it provide any assurance that

Conduent has upgraded the clearly insufficient systems that allowed the information to be stolen in the first place.

16. Months after the Data Breach was discovered and months after law enforcement was notified, Conduent publicly announced the Data Breach and notified those of its customers who were placed at risk of identity theft. It also sent notices to various states' Attorneys General and to its customers whose PII was acquired by criminals in the Data Breach.

17. While claiming that "we are unaware of any actual or attempted misuse of any information involved in this incident," the Notice Letter Plaintiff received says that that Class and Subclass members should obtain credit monitoring and identity theft protection services to help them detect possible misuse of PII. See Exhibits 1, 2. Conduent has thus acknowledged that Class and Subclass members are at a substantial risk of identity theft.

18. As a result of the Data Breach, Plaintiffs, Class and Subclass members have been and must continue to be vigilant and must review their credit reports for incidents of identity theft, and must educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

**B. The data breach was highly foreseeable, yet Defendant failed to take reasonable precautions.**

19. Given the type of data that Defendant collected and stored, it was highly foreseeable that bad actors would attempt to access that data without permission.

20. "[H]ackers are likely to be drawn to databases containing information which has a high value on secondary black markets," such as "identifying and financial data." Mark Verstraete & Tal Zarsky, *Optimizing Breach Notification*, 2021 U. ILL. L. REV. 803, 854–55 (2021). Consequently, "relevant and rational firms should engage in greater security investment and reduced collection—all steps to limit the prospects of a potential breach and subsequent notification." *Id.* at 855.

21. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

22. Because Defendant collected and stored identifying and financial information that is very valuable to criminals, it was highly foreseeable that a bad actor would attempt to access that data without permission.

23. On information and belief, Defendant frequently collects and stores PIIon behalf of its clients. This PII is provided to Conduent's clients, such as BCBSI, as part of the business relationship between the client and the source of

the PII. This treatment of PII is part of the service that Conduent provides to its clients. Therefore, the burden (if any) of implementing reasonable data security practices is minimal in comparison to the substantial and highly foreseeable risk of harm.

24. On information and belief, Defendant failed to adequately train their employees on even the basic cybersecurity protocols, including:

a. Effective password management and encryption protocols, including, but not limited to, the use of multi-factor authentication for all users;

b. Locking, encrypting and limiting access to computers and files containing sensitive information;

c. Implementing guidelines for maintaining and communicating sensitive data;

d. Protecting sensitive customer information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such information and how to securely send such information through a secure file transfer system to only known recipients; and

e. Providing focused cybersecurity awareness training programs for employees.

25. The FTC has noted the need to factor data security into all business decision-making. *Start With Security, A Guide for Business*, FTC (accessed June 9, 2022), https://bit.ly/3mHCGYz. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card

information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software. *Id.*

26.

26. On information and belief, Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and thousands of members of the proposed Class and Subclass to unscrupulous operators, con artists, and outright criminals.

27. On information and belief, Defendant violated its obligation to implement best practices and comply with industry standards concerning computer system security, which allowed Class and Subclass members' data to be accessed and stolen by criminals.

**C. Hurd's information was exposed in the data breach, which caused him to suffer concrete injuries.**

28. Plaintiff James Hurd has been a policyholder with Blue Cross and Blue Shield of Illinois for at least 4 years. As part of that banking relationship, Plaintiff necessarily provided his PII to BCBSI.

29. Based on the Notice, BCBSI provided Plaintiff Hurd's PII to Conduent as part of Conduent's provision of business processing outsourcing services to BCBSI

30. On November 4, 2025, Plaintiff Hurd received a data breach notification in the mail, informing him that his personally identifiable information was accessed in the breach.

31. Plaintiff Hurd's PII was compromised in the data breach and was very likely stolen and in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

32. Defendant continues to maintain Plaintiff Hurd's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Hurd had no relationship with Conduent and was never informed that BCBSI had provided Conduent access to his PII.

33. Plaintiff Hurd typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

34. In the time period that his information has been exposed as a result of the Conduent data breach, Plaintiff Hurd has suffered several incidents of identity theft.

35. On April 6, 2025, Plaintiff Hurd received an email from OneMain Financial, a financial services company, informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

36. On August 22, 2025, Plaintiff Hurd received an email from Avant, a financial services company, informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

37. On August 27, 2025, Plaintiff Hurd received another email from Avant informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

38. On September 1, 2025, Plaintiff Hurd received an email from NetCredit, a financial services company, informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

39. On September 18, Plaintiff Hurd received an email from CarGurus, a financial services company, informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name

40. On October 8, 2025, Plaintiff Hurd received another email from Avant informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

41. On October 31, 2025, Plaintiff Hurd received an email from Avant, a financial services company, informing Plaintiff Hurd that some party using his name and information attempted to take out a loan in his name. Plaintiff Hurd did not make or authorize this attempt to obtain credit in his name.

42. As a result of the data breach and these incidents of identity theft, Plaintiff Hurd has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the data breach, Plaintiff Hurd has spent significant time monitoring his accounts and credit score and has sustained emotional distress in addition to his lost time. This is time that was lost and unproductive and took away from other activities and duties.

43. Plaintiff Hurd also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant via BCBSI—which was compromised in and as a result of the Data Breach.

44. As a result of the fraudulent attempts to take out credit in his name, Plaintiff Hurd may suffer a loss of credit worthiness and inability to obtain credit in the future.

45. Plaintiff Hurd suffered lost time, annoyance, interference, and inconvenience as a result of the data breach and has anxiety and increased concerns for the loss of his privacy.

46. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals.

47. Prior to receiving the data breach notice in late November 2025, Plaintiff Hurd had no way of connecting the identity theft incidents to Conduent. As such, many similarly situated Class and Subclass members may have experienced identity theft incidents in 2025 that they had no way of knowing were in fact connected to Conduent's data breach.

48. As a result of the Data Breach, Plaintiff Hurd anticipates spending considerable time and money on an ongoing basis to try to mitigate and address

harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Hurd is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**C. Pettersen's information was exposed in the Data Breach, which caused him to suffer concrete injuries.**

49. Plaintiff Brandt Pettersen has been a policyholder with Blue Cross and Blue Shield of Illinois for at least 10 years. As part of that banking relationship, Plaintiff necessarily provided his PII to BCBSI.

50. Based on the Notice, BCBSI provided Plaintiff Pettersen's PII was provided to Conduent as part of Conduent's provision of business processing outsourcing services to BCBSI.

51. On November 4, 2025, Plaintiff Pettersen received a data breach notification in the mail, informing him that his personally identifiable information was accessed in the breach.

52. Plaintiff Pettersen's PII was compromised in the data breach and was likely stolen and in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

53. Defendant continues to maintain Plaintiff Pettersen's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Pettersen had no relationship with Conduent and was never informed that BCBSI had provided Conduent access to his PII.

54. Plaintiff Pettersen typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff Pettersen has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

55. As a result of the data breach, Plaintiff Pettersen has suffered a loss of time and has spent and continues to spend a meaningful amount of time on issues related to this Data Breach. In response to the data breach, Plaintiff has spent time monitoring his accounts and credit score. This is time that was lost and unproductive and took away from other activities and duties.

56. Plaintiff Pettersen also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant SRP—which was compromised in and as a result of the data breach

57. Plaintiff Pettersen suffered lost time, annoyance, interference, and inconvenience as a result of the data breach and has anxiety and increased concerns for the loss of his privacy.

58. Plaintiff Pettersen has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals.

59. As a result of the Data Breach, Plaintiff Pettersen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the data breach. As a result of the Data Breach, Plaintiff Pettersen is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### E. All Class Members Have Suffered Harm as a Result of the Breach.

60. Because personally identifying and financial information has been accessed by criminals, Plaintiffs and the Class have suffered concrete and ongoing injuries.

61. Plaintiffs and the Class are at an imminent and substantial risk of identity theft.

62. According to experts, one out of four Data Breach notification recipients become a victim of identity fraud. Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims, THREATPOST.COM (Feb. 21, 2013), https://bit.ly/3zB8Uwv.

63. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PHI can be worth up to $4,000.00 depending on the type of information obtained. See Ben Luthi, *Here's How Much Your Personal Information is Selling*

*for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

64. The value of Plaintiff and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

65. It can take victims years to spot identity or PII theft, giving criminals plenty of time to milk that information for cash.

66. One such example of criminals using PII for profit is the development of "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no

longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

67. Cyber-criminals can cross-reference two sources of PII to marry unregulated or partial data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete "Fullz" dossiers on individuals.

68. The development of "Fullz" packages means that stolen PII from the data breach can easily be used to link and identify it to Plaintiffs' and the proposed Classes' and Subclass's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is likely what is already happening to Plaintiffs and members of the proposed Class and Subclass, and it is reasonable for

any trier of fact, including this Court or a jury, to find that Plaintiffs' and other members of the proposed Class's and Subclasses' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

69. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

70. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

71. In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

72. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect

themselves, Plaintiffs and the Class and Subclass members will need to remain vigilant against unauthorized data use for years or even decades to come.

73. Moreover, the Data Breach has diminished the value of Plaintiffs' the Class's and Subclass's personal information.

74. The FTC has recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency." *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtabl*e, FTC (Dec. 7, 2009), https://bit.ly/3xKfzmu.

75. Since the subject PII was included in the Data Breach, Plaintiffs' and the Class's and Subclass's information has already been accessed by criminals, which decreases its value in the marketplace.

76. Therefore, the value of Plaintiffs' and the Class's and Subclass's personal information was reduced by the data breach.

77. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use

reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

78. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs, the Subclass and the Class.

79. None of those injuries would have occurred if Defendant had implemented reasonable data security practices.

## CLASS ACTION ALLEGATIONS

80. Pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), Plaintiffs seek certification of a Class defined as follows ("the Class"):

> All residents of the United States whose personal information was stored or maintained by Conduent Business Services, LLC and which was compromised in connection with the data breach beginning on or around October 21, 2024.

81. Pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), Plaintiffs seek certification of a Subclass defined as follows:

> All customers or policyholders of Blue Cross and Blue Shield of Illinois whose personal information was stored or maintained by Conduent Business Services, LLC and which was compromised in connection with the data breach beginning on or around October 21, 2024.

82. Excluded from the Class and Subclass are: (a) Defendant and its officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

83. *Ascertainability*. The Class and Subclass can be readily identified through Conduent's records, which is demonstrated by the fact that many Class and Subclass members have already been identified and sent notice letters regarding the Data Breach.

84. *Numerosity*. Based on publicly-available reports, as many as 10.5 million individuals were affected by the Conduent Data Breach. Therefore, the Class and Subclass are so numerous that individual joinder is impracticable.

85. *Typicality*. Plaintiffs' claims are typical of the Class and Subclass they seek to represent. Like all Class and Subclass members, Plaintiffs' personal information was exposed in the Data Breach as a result of Defendant's failure to implement reasonable data security measures. Thus, Plaintiffs' claims arise out of

the same conduct and are based on the same legal theories as those of the absent Class and Subclass members.

86. *Adequacy of Class Representative*. Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. They are aware of their fiduciary duties to absent Class and Subclass members and are determined to faithfully discharge their responsibility. Plaintiffs' interests are aligned with (and not antagonistic to) the interests of the Class and Subclass.

87. *Adequacy of Counsel*. In addition, Plaintiffs have retained competent counsel with considerable experience in class action and other complex litigation, including data breach cases. Plaintiffs' counsel have done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class or Subclass.

88. *Commonality and Predominance*. This case presents numerous questions of law and fact with answers common to the Class and Subclass that predominate over questions affecting only individual class members. Those common questions include:

a. Whether Defendant had a duty to use reasonable care to safeguard Plaintiffs, the Class's and the Subclass's PII;

b. Whether Defendant breached the duty to use reasonable care to safeguard the Class's and Subclass's PII;

c. Whether Defendant breached its contractual promises to safeguard Plaintiffs and the Class's and Subclass's PII;

d. Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing sensitive PII;

e. Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiffs' the Class's and Subclass's PII from unauthorized release and disclosure;

f. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiffs' the Class's and the Subclass's PII from unauthorized release and disclosure;

g. Whether the Data Breach was caused by Defendant's inadequate cybersecurity measures, policies, procedures, and protocols;

h. Whether Defendant is liable for negligence, gross negligence, or recklessness;

i. Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the PII violated applicable state laws;

j. Whether Plaintiffs, the Class and the Subclass were injured as a proximate cause or result of the Data Breach;

k. What the proper measure of damages is; and

l. Whether Plaintiffs, the Class and the Subclass are entitled to restitutionary, injunctive, declaratory, or other relief.

89. *Superiority and Manageability*. A class action is superior to individual adjudications because joinder of all Class and Subclass members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class and Subclass member.

90. *Injunctive or Declaratory Relief*. In addition, Defendant acted or failed to act on grounds that apply generally to the Class and Subclass, such that final injunctive or declaratory relief as to any one class member is appropriate as to all class members.

**CAUSES OF ACTION**

**Count 1: Negligence**

91. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-90.

92. Plaintiffs bring this count on their own behalf and on behalf of the Class and Subclass.

93. Plaintiffs and the Class and Subclass entrusted their PII to institutions who turned that information over to Defendant. Knowing this, Defendant owed to Plaintiffs and the Class and Subclass a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

94. Defendant owed a duty of care to Plaintiffs and the Class and Subclass because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the data breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs's, the Class's and Subclass's PII by failing to properly supervise both the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

95. Defendant owed these duties to Plaintiffs and the Class and Subclass because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought

and obtained Plaintiffs' the Class's and Subclass's personal and financial information in the conduct of its business, and Defendant retained that information.

96. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII.

97. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and the Class and Subclass and the importance of exercising reasonable care in handling it.

98. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiffs and the Class and Subclass, which actually and proximately caused the Data Breach and Plaintiffs' the Class's and Subclass's injury.

99. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' the Class's and Subclass's actual, tangible, injury-in-fact and damages, including, without limitation, theft of their PII by criminals, improper disclosure of their PII,

lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach.

**Count 2: Negligence *Per Se***

100. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-90.

101. Plaintiffs bring this count on their own behalf and on behalf of the Class and Subclass.

102. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs and members of the Class and Subclass's PII.

103. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, employees' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the members of the Class and Subclass's sensitive PII.

104. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect its customers' PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct

was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a Data Breach, including, specifically, the immense damages that would result to its customers in the event of a breach, which ultimately came to pass.

105. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class and Subclass.

106. Defendant had a duty to Plaintiffs and the members of the Class and Subclass to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' the Class's and Subclass's PII.

107. Defendant breached its duties to Plaintiffs and members of the Class and Subclass under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's and Subclass's PII.

108. Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

109. As a direct and proximate result, Plaintiffs suffered actual losses and damages, including, without limitation, theft of their PII by criminals, improper

disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence.

## PRAYER FOR RELIEF

110. Plaintiffs, individually and on behalf of all others similarly situated, hereby demands:

a. Certification of the proposed Class and Subclass;

b. Appointment of the undersigned counsel as class counsel;

c. An award of all damages, including attorneys' fees and reimbursement of litigation expenses, recoverable under applicable law;

d. Restitution or disgorgement of all ill-gotten gains; and

e. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

113. Plaintiff demands a jury trial on all applicable claims.

Dated: November 17, 2025

By */s/ Neil Grossman*
Neil Grossman

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
40 Calumet Avenue
Lake Hiawatha, New Jersey 07034
(973) 335-6409
Fax (973) 335-3717

Michael J. Boyle, Jr. (*pro hac vice* to be filed)
4200 Regent Street, Suite 200

Columbus, OH 43219
Tel: (614) 578-5582
Email: mboyle@bgandg.com

Peretz Bronstein (*pro hac vice* to be filed)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Counsel for Plaintiffs James Hurd, Brandt Pettersen, and for the proposed Class and Subclass*